## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**STEPHANIE PARKER,**

      **Plaintiff,**

v.                      **CASE NO.: 08:10-cv-01635-JSM-TBM**

**SYNIVERSE TECHNOLOGIES, INC.,**
**a Foreign Profit Corporation,**

      **Defendant.**

_____/

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### AND MEMORANDUM OF LAW IN SUPPORT THEREOF

Defendant, Syniverse Technologies, Inc. ("Defendant"), through its undersigned attorneys, files its Motion for Summary Judgment and Memorandum of Law in Support Thereof. Plaintiff alleges Defendant, her former employer, violated the Fair Labor Standards Act ("FLSA") by failing to pay Plaintiff for hours worked in excess of forty within a work week.

Specifically, Plaintiff alleges Defendant failed to comply with 29 U.S.C. § § 201-209 because Defendant was aware that Plaintiff performed non-exempt job duties, but still refused to pay Plaintiff overtime hours for hours worked over forty in a workweek. Defendant is entitled to summary judgment on Plaintiff's claim for recovery of overtime compensation because Plaintiff was an exempt employee under the administrative and computer professional exemptions under the FLSA.

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes

1452887.1

demonstrate the absence of a genuine issue of material fact." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To discharge this burden, the movant must point out to the court that there is an absence of evidence to support the nonmoving party's case. See *id.* at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electronic Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

## I.    STATEMENT OF FACTS[1]

Defendant is a technology based company that provides mobile connectivity to billions of mobile subscribers. (Hurst Decl., ¶2). Syniverse has a complex system of hardware and software which connects cell phone users throughout the world. *Id.* Most mobile operators, such as Cingular, Verizon, T-Mobile, and AT&T, do not directly connect with each other. *Id.* Instead, Defendant provides a service of acting as a hub to enable various mobile operators to communicate with each other, which allows the customers of different carriers to communicate

---

[1] Defendant will accept Plaintiff's testimony as true for purposes of this Motion only.

1452887.1

directly. *Id.* One of the systems which performs this function is called Integrated Services Digital Network User Part ("ISUP"). *Id.*

Plaintiff was employed by Defendant from 1997 until 2009. (P. Response to Court Interrogatories). From 2005 until December 2009, Plaintiff worked as a Senior Network Provisioner. (Morrow Decl., ¶2, P.Depo., p. 29:24-30:9). The duties and responsibilities of a Network Provisioner are the same as a Senior Network Provisioner, although a Senior Network Provisioner may be assigned more complex projects. (Hurst Decl., ¶3). A Senior Network Provisioner is responsible for designing and provisioning ISUP routes to and from the SS7 Hub/System so that messages can be sent from one carrier to another through signaling companies and adjacent networks. *Id.* Designing and provisioning ISUP routes is an engineering function that requires a Provisioner to develop a path whereby an originating point code and destination point code can communicate with each other. (Hurst Decl., ¶5). The originating point code is the main operational switch/system within the network and the destination point code is the customer's switch/system that is utilizing the service. *Id.* Plaintiff's job of designing the ISUP routes is similar to developing a means to send the product to the customer. *Id.* Customers contract with Defendant to use Defendant's SS7 Hub and ISUP signaling; Plaintiff's job was to provide a route to deliver this service. *Id.* However, some customers did not need the provisioning provided by Plaintiff and engineered their own routes. *Id.*

According to Plaintiff, 75% of her work as a Senior Network Provisioner involved "rehomes." (P.Depo., p. 66:8-10). Plaintiff referred to this as "making messaging work," which Plaintiff defined as "engineering the switch or system to make sure the messaging worked." (P.Depo., p 63:2–65:23). In layman's terms, this meant receiving a request from a customer for

re-routing of the network between two carriers to be able to communicate. (Hurst Decl., ¶13). This involved analyzing the options, determining the best route for this communication to occur, and designing the ISUP route so that the communication would work. (Hurst Decl., ¶13; P.Depo., p. 71:16-73:11).

The first step in designing, provisioning and routing ISUP is to analyze a customer's order request to determine how to design a route and validate the information. (Hurst Decl., ¶6). When Plaintiff was sent a point code, part of her responsibilities would be to interpret that point code and make certain that both the originating point code and destination point code could "speak" to each other. (P.Depo., p. 21:11-17). This involves analyzing the capabilities of the system, considering various alternatives and determining whether conflicts exist, and requires knowledge of how routing works as well as knowledge and experience in provisioning. *Id.*

After receiving an order from a customer, Plaintiff would design and provision routes to ensure symmetrical routing of customer ISUP traffic with third-party hub providers and local exchanges, placing orders between carriers to ensure that a network is established between two parties. (Hurst Depo., p. 7:11-16, Hurst Decl., ¶7). A Senior Network Provisioner has many different options when trying to route or place an order. (Hurst Depo., p. 19:10-13). Plaintiff used judgment to determine what regional provider to use in deciding what orders must be placed, including considering the possible complications of the placement. *Id.* After a Senior Network Provisioner reviews the point codes and determines whether a point code is already operational in the system, the Provisioner would work with Defendant's engineering group to coordinate so the two point codes could ultimately "speak" to each other. (P.Depo., p. 23:9-18). Often times, both the engineer and the Senior Network Provisioner would do the same job functions. (P.Depo., p. 83:3-85:12). Senior Network Provisioners have to be careful when they

4

are placing an order to ensure what they are instructing a local exchange carrier to do is correct and that the local exchange carrier can break out and branch out into multiple different areas. (Hurst Depo., p. 19:10-20).   In addition, if Plaintiff did not provide accurate information, the system would fail.   (P.Depo., p. 58:3-6).   If any of the information Plaintiff provided was incorrect, it could have stopped a carrier's subscribers' ability to roam on another carrier's network, thereby effectively shutting down a carrier's ability to do business.  (P.Depo., p. 67:10-21, Hurst Decl., ¶10).   For example, Plaintiff could potentially block all incoming calls from an entire carrier, and it could take up to 45 days for a mistake to actually be recognized.   (Hurst Decl., ¶10).

The process of designing routing is complex engineering work.  (Hurst Decl., ¶11).   In order for Plaintiff to fulfill an order, it was required that she have knowledge as to how placing a route would affect thousands of other customers.   *Id.*   A Senior Network Provisioner must understand routing of STPs (switches/systems), the network at the carrier level, point codes, and the local exchange.   *Id.*   Plaintiff believed her duties as a Senior Network Provisioner were more complex than just order entry and believed that the tasks she performed on a daily basis were engineering functions.  (P.Depo., p. 36:8-15, 46:22-25, 48:9-15).   Plaintiff compared herself to engineers in that she was doing similar work.  (P.Depo., p. 55:21-24).   In fact, the position held by Plaintiff was previously classified as an engineer position.  (P.Depo., p. 49:25-50:6).   During the last eighteen months of her employment, Plaintiff tried to persuade Syniverse to increase her position from pay grade 9 to pay grade 10 based upon Plaintiff's own assessment that she was performing "engineering tasks on a daily basis."  (P.Depo., p. 51:13-18, Ex. 3).[2]

---

[2]  Plaintiff may argue that her job was just order entry and looking up point code in a table. This is an over simplification of Plaintiff's job duties.  The rehomes on which Plaintiff worked 75% of the time involved the most complex jobs.  (P.Depo., p. 29:10-16).  Plaintiff admitted in her

Plaintiff also provided technical support to customers. (Owens Depo., p.17:23-18:22). If a customer reported a problem, Plaintiff would do the initial research to figure out whether there was a potential routing conflict by taking the information, using tools to see how the route was initially provisioned, determining whether it can signal through Defendant's STP's (switches), and determining whether there was live traffic on the route. (Owens Depo., p.18:24-19:11). In addition, Plaintiff gathered requirements and tested enhancements in the SOS ordering system and verified if the developer did the enhancement correctly. (P.Depo., p. 124:25-125:5).

As mentioned, approximately 75% the work Plaintiff performed involved rehomes, wherein Plaintiff engineered the switch or system to make messaging work. (P.Depo., p. 65:19-23, 66:8-10). Rehome projects are more complex, which is why they were assigned to the Senior Network Provisioner. (P.Depo., p. 66:11-14). With rehomes, one of Plaintiff's job duties was to decide with which local exchange carrier ("LEC") to place the order. (P.Depo., p. 26:25-27:7, 66:15-17). Plaintiff would have to determine what needed to be done to make the rehome work, which could involve adding specific point codes, removing point codes from the system in certain circumstances, and determining where traffic should be directed. (P.Depo., p. 66:18-67:9). If there was a conflict, Plaintiff's job was to determine a resolution, which could not be answered merely by looking in a table. (P.Depo., p. 70:15-22, 72:20-73:7). For most of the rehomes on which Plaintiff worked, the point codes were not already in the system. (P.Depo., p. 68:14-23). To complete her job with a single point code would take Plaintiff approximately one hour. (P.Depo., p. 18:12-19). For rehomes which involved hundreds to thousands of point codes, it would take a month. (P.Depo., p. 18:9-23).

---

deposition that most of the routing information for rehomes was not in the table. (P.Depo., p. 67:22-68:23). Further, Plaintiff admitted in her deposition that the job was not order entry and involved the performance of engineering tasks on a daily basis. (P.Depo., p. 34:22-37:16).

1452887.1

For approximately 55 percent of the rehomes Plaintiff handled, she would serve as the project coordinator. (P.Depo., p. 106:25-107:24). Those functions included coordinating with the customer and with anyone internally that was necessary to bring together to get the project done. (P.Depo., p. 107:25-108:4). When Plaintiff served in the role of project manager, she did not require supervision for her coordination duties and was capable of fulfilling the coordinator duties on her own. (P.Depo., p. 108:5-109:2).

There is no manual which outlines the steps a Senior Network Provisioner needs to take to perform his or her job. (Hurst Depo., p. 21:4-6). There is a three or four page work instruction document which provides a rough overview of the steps that need to be performed in order to ensure a job is completed. (P.Depo., p. 127:1-128:25; Hurst Depo., p. 21:7-14). However, the work instruction is only a rough overview and does not instruct the Provisioner on what to do in certain situations; such information only comes from actual work experience. (Hurst Depo., p. 21:19-23). According to Plaintiff, this document did not tell the Senior Network Provisioner how to come up with a resolution to a problem, but merely that she was supposed to find a resolution. (P.Depo., p. 129:10-13).

Plaintiff performed her job duties as a Senior Network Provisioner on her own without day to day supervision. (P.Depo., p. 76:15-77:1). Once Plaintiff received a request from a customer, she could begin working on filling the request without showing the request to her supervisor. (Hurst Decl., ¶16). In addition, Plaintiff's manager did not have to sign off on a completion notice before Plaintiff was able to send it to the customer. *Id.* Plaintiff was not supervised by the engineers; instead, Plaintiff worked with the engineers in a collaborative effort and typically instructed the engineers how to build a translation or where to point the traffic. (P.Depo., p. 85:13-16, Owens Depo., p. 33:19-23).

7

## II.     MEMORANDUM OF LAW

A.     Computer Professional Exemption

29 U.S.C. 213(a) provides an exemption from the FLSA's overtime and minimum wage requirements for:

> (17)   any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is—
>
> (A)     The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>
> (B)     The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (C)     The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>
> (D)     A combination of the aforementioned duties, the performance of which requires the same level of skills.

See 29 U.S.C. §213(a)(17).

The computer exemption was considered by the court in *Bagwell v. Florida Broadband, LLC*, 385 F.Supp.2d 1316 (S.D. Fla. 2005).  In *Bagwell*, the plaintiff was a Network Operation Engineer whose primary duty was developing, improving, and making the employer's network system function reliably.  The plaintiff wrote specifications for wireless network topology, wrote specifications for routers and switches used in the network, specified protocols used in the network, designed and assured proper installation of all cabling infrastructure including fiber optic, maintained network availability and security, interacted with clients for level 3 support, consulted with clients for LAN design and technical specifications, interacted with vendors for

8

pricing and availability of materials, scheduled technical field staff for surveys and installations, scheduled maintenance of network, maintained detailed network documentation, approved site installations of infrastructure and equipment, designed and implemented LAN infrastructure, recommended purchases of network equipment, and evaluated emerging technologies. His job required an understanding of network characteristics and the standards that are used in that network and also required knowledge of routing and switching. *Id.* at 1318.

The court determined that based upon the above-listed duties, the plaintiff was involved in the design, development, and analysis of the computer system or program based on and related to user or system design specifications. *Id.* at 1327. Additionally, the plaintiff was applying systems analysis techniques and procedures, including consulting with users, "to determine hardware, software, or system functional specifications." The court found that the plaintiff applied this highly specialized knowledge to his network engineering position on a regular basis; thus, the computer professional exemption applied.[3] *Id.* at 1328.

Similarly, in *Pellerin v. Xspedius Management Co. of Shreveport L.L.C.*, 432 F.Supp.2d 657, 660 (W.D. La. 2006), the plaintiff's job duties were to provide maintenance and support to pre-existing software applications, which included adding additional input fields to pages, correcting bugs or incorrect calculations in reports, and changing the codes on reports. The plaintiff would be told what needed to be written, and he would code the appropriate instructions to the computer. However, he was not told what language to use. *Id.* at 660. The majority of the plaintiff's work was maintenance and debugging. Debugging required the plaintiff to rely on his

---

[3] The DOL amended its regulations in 2004 which dispensed with the requirement that the computer professional exemption apply "only to highly-skilled employees who have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge; eliminated any reference to educational requirements; and eliminated the requirement that the employee's work require the exercise of independent judgment and discretion." See *Bobadilla v. MDRC*, 2005 WL 2044938 (S.D.N.Y. 2005).

specialized knowledge and experience in the field of computer systems, analysis, and programming. The court noted that the level of expertise and skill required to qualify for the exemption is generally attained through combinations of education and experience in the field and that no particular academic degree or licensure is required. *Id.* at 663. Therefore, the court found that the plaintiff's primary duty was the development, analysis, creation, testing and/or modification of computer programs, rendering him a computer professional exempt from the overtime requirements of the FLSA. *Id.*

Additionally, in *Bergquist v. Fidelity Information Services, Inc.*, 399 F.Supp.2d 1320, 1331 (M.D. Fla. 2005), the plaintiff was employed as a computer programmer whose primary job duties involved continuing on a design, continuing with programming, and determining other things that needed to be done on a project to bring it to its fruition. The plaintiff stated he was designing programs and that the work was not routine. *Id.* In designing a program, the plaintiff would receive a business design from a business analyst, and after reviewing the design, the plaintiff would attempt to develop a program to reflect and fulfill that design. *Id.* at 1331. The plaintiff testified that in reviewing the business design, he would assist the business analyst with technical details, conduct intensive research to find out what technical steps were necessary, and then design and develop the program. The plaintiff also testified that he may be placed on a programming team whereby a project leader would assign specific aspects of the design to the team members. In doing so, he generally was not supervised, as he was there to develop his piece of the design which would subsequently be integrated with the other team members' work. *Id.* The court found that the plaintiff was exempt under the computer exemption, as his primary duties required work involving theoretical and practical application of highly-specialized knowledge in computer systems analysis, programming and software engineering. *Id.* at 1332.

1452887.1

Plaintiff was employed by Defendant as a computer professional as defined in 29 U.S.C. §213(a)(17)(D), as she performed a combination of all of the duties outlined in subsections (A), (B) and (C).   Specifically, Plaintiff's primary duties as a Senior Network Provisioner involved applying systems analysis techniques and procedures, including consulting with users to determine system functional specifications; designing, developing, and analyzing computer systems or programs; and designing programming relating to machine operating systems.   As such, Defendant was not required to pay Plaintiff overtime pay, as Plaintiff was an exempt computer professional.   Plaintiff is unable to establish a genuine dispute as to any material fact as to this exemption.   Plaintiff's job duties were similar to those duties which rendered the plaintiffs exempt by the courts discussed above, falling within the subsections of 29 U.S.C. §213(a)(17) as follows:

> (A)   The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications

Plaintiff's job required an understanding of network characteristics and the standards that are used in that network and also required knowledge of routing and switching.   Similar to the plaintiff in *Bagwell*, Plaintiff applied systems analysis techniques and procedures, including consulting with users to determine system functional specifications.   Plaintiff was required to use her analytical skills to determine and design the proper routing, applying her highly specialized knowledge to her position on a regular basis in designing and provisioning routes for ISUP traffic. (Hurst Depo., p. 7:11-16).   Similar to the plaintiff in *Bagwell*, Plaintiff had to understand routing of STPs, the network at the carrier level, point codes, and the local exchange.   (Hurst Decl., ¶11).   Plaintiff had to rely on her knowledge and experience in determining resolutions, as

11

she could not simply determine the proper routes and resolve conflicts by looking in a table or manual. (P.Depo., p. 70:15-22, 72:20-73:7).

As with the plaintiff in *Pellerin*, Plaintiff had to rely on her specialized knowledge and experience in the field of computer systems, analysis, and programming in performing her job duties. The *Pellerin* court relied heavily upon this fact in determining that the plaintiff was exempt under the computer professional exemption. Additionally, Plaintiff performed similar functions as the plaintiff in *Bergquist* in that Plaintiff designed routes, which was not routine work. Instead, the functions performed by Plaintiff involved high skilled engineering tasks. (P.Depo., p. 36:8-15, 46:22-25, 48:9-15). As with the plaintiff in *Bergquist*, after receiving information from a customer, Plaintiff would attempt to develop a route to reflect and fulfill the customer's request. Plaintiff also conducted intensive research to find out what technical steps were necessary in designing the route and was not supervised in her work.

The critical factors relied upon by the courts above in considering the computer professional exemption are all present in the instant matter. Important in this analysis is Plaintiff's own belief as to the technical level of her position. For eighteen months, Plaintiff made efforts to have her position reclassified as a grade 10 based upon her belief that she was performing engineering work. (P.Depo., p. 47:16-22). In 2009, Plaintiff also described her job duties in a self evaluation whereby she listed her duties to include "Improve customer satisfaction by identifying and resolving SS7 routing conflicts to meet on-time delivery of SS7 route requests," "researched routing issues to identify how routing conflicts could be corrected by the customer, the far end and/or by the carriers," "When working rehome projects, I inform engineers if a routing conflict is found and what routing changes are required to be completed in advance of a scheduled rehome," and "I've prepared and prioritized system enhancements and

identified which groups would benefit from the system improvements to benefit the customer and the company." (P.Depo., p. 113:10-117:20; Ex. 5).

As Plaintiff's own words describe, Plaintiff acted as a technical expert for routing issues and provided technical support to customers both internal and external, which required the application of systems analysis procedures and consulting with users to determine functional specifications. (See also Hurst Decl., ¶8). Plaintiff's duties of providing technical support and working with the customers to determine routing needs and analyzing whether the existing systems could service the needs of the customers were job duties falling within Section 17(A).

(B)   The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications

Plaintiff's duties of analyzing existing routes and creating new routes (i.e., systems) based on customer specifications were duties falling within Section 17(B). Plaintiff also issued letters of authorization ("LOA") to customers and third party providers and sent completion notices to customers, which involved documenting computer systems based on and related to user or system design specifications. (Hurst Decl., ¶8). Plaintiff provided technical support to sales and implementation when necessary on new opportunities, and technical support to sales and implementation on pre-implementation as needed on complex designs and new products. *Id.* Such duties also fell within the analysis and creation tasks under subsection (B).

Other tasks within 17(B) included Plaintiff's research for finance on billing issues and work with Client Relations and Finance to resolve customer billing issues. (Hurst Decl., ¶9). In addition, Plaintiff gathered requirements and tested enhancements in the SOS ordering system and verified if the developer did the enhancement correctly. (P.Depo., p. 124:25-125:5). Thus, many of the duties performed by Plaintiff involved the design, development, documentation,

analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications.

> (C)    The design, documentation, testing, creation or modification of computer programs related to machine operating systems

Plaintiff's job duties of working system enhancements falls within Section 17(C).  In addition, Plaintiff's tasks of working with third party hub providers and LECs to provision on-net and off-net routes ensuring symmetrical routing involved the design, documentation, testing, creation or modification of computer programs related to machine operating systems.  Plaintiff's work involved receiving a request from a customer for two carriers to be able to communicate, analyzing the options, determining the best route for the communication to occur, and designing the system.  In addition, when there was a known issue, such as a problem with billing or where manual entries had to be entered, Plaintiff would consult with the sales department on ways that Defendant could create or modify existing systems to service the needs of customers.  (P.Depo., p. 102:5:-14).  Such tasks fall within subsection (C).

As the duties discussed above comprised at least 75% of the work performed by Plaintiff, Plaintiff's job as a Senior Network Provisioner was exempt under 29 U.S.C. §213(a)(17)(D). Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim.

B.    Administrative Exemption

Alternatively, Plaintiff was exempt from the minimum wage and maximum hour requirements of the FLSA under the administrative exemption set forth in 29 U.S.C. §13(a)(1). The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act means any employee:

> (1) Compensated on a salary or fee basis at a rate of not less than $455 per week;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. §541.200.

1.    Salary Requirement

An employee is considered "paid on a salary basis" if she "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. §541.602.  Plaintiff meets the salary requirement as she earned a salary of at least $1,923.08 bi-weekly, which exceeds the $455 weekly minimum under the Act.  (Morrow Decl., ¶3).  Plaintiff's compensation was set and did not vary based on the quality or quantity of work performed.  *Id.*   Therefore, Plaintiff satisfies the first element of the administrative exemption.

2.    Office Or Non Manual Work Directly Related To The Management Or General Business Operations

Once it is established that a plaintiff satisfies the salary requirement, the next criteria that must be established is that the primary duties performed must be in the nature of office work or non-manual work.  29 C.F.R. §541.200(a)(2).   Here, Plaintiff's work was solely office, non-manual work. (Hurst Decl., ¶4, P.Depo., p. 14:6-21).  Next, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers. 29 C.F.R. §541.201.  The phrase "directly related to the management or general business operations" refers to the type of work performed by the employee.   To meet this requirement, an employee must perform work directly related to

assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.[4]

According to the regulations,

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.   Some of these activities may be performed by employees who also would qualify for another exemption.

> An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers. Thus, for example, employees acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt.

29 C.F.R. § 541.201.

For example, in *Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir. 2004), insurance agents filed a complaint against their employer alleging they were entitled to back wages pursuant to overtime requirements of the FLSA.  The plaintiffs spent the majority of their time servicing existing customers.   Their duties included promoting sales, advising customers, adapting policies to customer's needs, deciding on advertising budget and techniques, hiring and training staff, determining staff's pay, and delegating routine matters and sales to staff.  The

---

[4] In certain contexts, the "production work" paradigm is of limited utility.  See *Sessoms v. Gartner & Co.*, 2006 WL 1102323 (M.D. Tenn. 2006) (the productive/administrative dichotomy may be inapplicable where the business of the employer is providing services as opposed to products or sales).

court concluded that these duties are similar to administrative, rather than production, tasks. *Id.* at 627.

Similarly, in *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1 (1st Cir. 1997), the plaintiffs were marketing representatives who were treated as exempt. The employer was in the business of designing, creating, and selling insurance policies to the public. The court found that the "products" generated by the employer are insurance policies themselves. Specifically, the court noted that since the marketing representatives were in no way involved in the design or generation of insurance policies, the very product "that the enterprise exists to produce and market," they could not be considered production employees. *Id.*, citing to *Dalheim v. KDFW-TV*, 918 F.2d 1220, (5th Cir. 1990). Accordingly, the marketing representatives were properly classified as exempt under the administrative exemption. *Reich*, 126 F.3d at 14.

Here, Plaintiff's duties were directly related to the business operations of Defendant. In fact, the duties performed by Plaintiff are specifically identified in the regulations as being the type of work directly related to management or general business operations. As the regulations set forth, work in functional areas such as quality control, research, computer network, internet and database administration are considered to be duties directly related to management or general business operations. See 29 C.F.R. 541.201(b). Plaintiff performed each of these duties as the primary function of her job.

Plaintiff's primary job duties were those of administration, not production. Plaintiff's daily function was not generating the product or service that Defendant was in the business of providing. (Hurst Decl., ¶12). Defendant provides a platform for mobile operator services to use as a hub for cell phone roaming. (Hurst Depo., p. 6:7-13). Plaintiff's job was to design, provision and route ISUP through signaling companies and adjacent networks. (Hurst Decl., ¶3).

1452887.1

While that function is integral to the operations of Defendant, the tasks actually performed by Plaintiff were not the very services Defendant is in the business of providing. (Hurst Decl., ¶12). Defendant's business is creation of a telecommunications system (in this case, the SS7 Hub). (Hurst Decl., ¶5).   Plaintiff's job was to analyze and create ways for customers to access that system; because of the highly technical nature of Defendant's business, Plaintiff's function involved the performance of system analysis and engineering; however, she was not designing the underlying telecommunication system, which already exists at Syniverse, but rather engineering ways to make certain the service the customer requested can be delivered from point A to point B.   (Hurst Decl., ¶12).   As evidence of this, some companies did not utilize the provisioning service provided by Network Provisioners and instead engineered their own routes. (Hurst Decl., ¶5). Accordingly, the second element of the administrative exemption is satisfied.

        3.      Discretion and Independent Judgment With Respect to Matters of Significance

To satisfy the third and final element of the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. §541.202(a).   Generally, "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.*   Some of the factors to consider when determining whether an employee meets the "discretion and independent judgment" prong of the administrative exemption include, but are not limited to: "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; and whether the employee performs work that

affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business." *Id.*

While the administrative exemption requires that an employee exercise discretion and independent judgment, an employee who refers to manuals "containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills" may still be exempt. 29 C.F.R. §541.704. See *Goff v. Bayada Nurses, Inc.*, 424 F. Supp. 2d 816 (E.D. Pa. 2006) (on-call/staff supervisor for in-home nursing care provider was covered by the administrative exemption where her main task was matching up specific patient needs with specific nurse skills, even though it was within the parameters of a nurse assignment coding system, because she used discretion in making the placements). For example, in *Renfro v. Indiana Michigan Power Co.*, 497 F.3d 573 (6th Cir. 2007), the court held that technical writers employed by a power company were properly classified as exempt administrative employees in that:

> they do not work under constant supervision and, when preparing a procedure, select the best method to maintain the plant's equipment. Their job requires them to create a clear and understandable set of highly technical instructions for maintaining the electrical and mechanical systems of a particular piece of equipment. Looking to various source materials for some of the technical information and using a computer to aid research and recommendations does not detract from the import of the discretion and independent judgment exercised. Channeling discretion through a manual on procedure does not eliminate the existence of that discretion.

*Id.* at 577.

Here, Plaintiff exercised discretion and independent judgment in fulfilling her tasks as a Senior Network Provisioner. Plaintiff compared and evaluated several possible courses of conduct in determining how to design a route, in identifying how routing conflicts can be

corrected, and in providing technical support to customers. (Hurst Decl., ¶6). This analysis required Plaintiff to consider various possibilities to ensure routing conflicts would be avoided. (*Id.*; P.Depo., p. 72:1-73:11) Plaintiff carried out major assignments in the operations of Defendant's business, as ISUP routing is an integral portion of the services Defendant provides and the routing work performed by Plaintiff affects Defendant's business operations to a substantial degree. (Hurst Decl., ¶14).

Plaintiff had to exercise discretion and independent judgment in designing a route in ensuring the order is correctly placed. (Hurst Decl., ¶11). Plaintiff admitted that her job duties were akin to engineering tasks and that her job was not merely order entry. (P.Depo., p. 36:8-15, 46:22-25, 48:9-15, 55:21-24). Plaintiff performed her job duties on her own without day to day supervision. (P.Depo., p. 76:15-77:1). Once Plaintiff received a request from a customer, she could begin working on filling the request without showing the request to her supervisor. (Hurst Decl., ¶16). Plaintiff's manager did not have to sign off on a completion notice before sending it to the customer. *Id.*

Plaintiff's role as a project coordinator also required the exercise of independent discretion and independent judgment with matters of significance, as her duties required her to coordinate with the customer and with anyone internally that was necessary to bring together to get the project done. (P.Depo., p. 107:25-108:4). When Plaintiff served in the role of project manager, she did not require supervision for her coordination duties and was capable of fulfilling the coordinator duties on her own. (P.Depo., p. 108:5-109:2). Thus, Plaintiff often bore the responsibility of ensuring that the rehome projects were successfully coordinated.

Although Plaintiff had access to a work instruction document which provided a rough overview of the steps that need to be performed in order to ensure a job is completed, this is

only a rough overview and did not instruct Plaintiff as to what to do in certain situations or provide a step by step guideline for the job. (Hurst Decl., ¶15). This instruction booklet only walked through the steps and did not provide any guidance on how to actually complete the steps. (P.Depo., p. 127:1-129:13).[5]

Provisioning involved working with different carriers. Thus, Senior Network Provisioners worked with different work instruction forms used for different carriers which provided guidelines of how to process an order and the process that is followed to complete an order. (P.Depo., p. 125:19-127:9; Ex. 11). The work instruction form for LATALink showed the order by which the process is completed but does not instruct someone how to complete the process or how to resolve a discrepancy between Defendant, the network provider and the customer. (P.Depo., p. 128:2-17). Plaintiff was responsible for coming up with the resolution to a discrepancy. (P.Depo., p. 128:15-25). The LATALink work instruction did not instruct Plaintiff how to come up with a resolution but merely instructed that the Senior Network Provisioner was responsible for finding a resolution. (P.Depo., p. 129:1-13). Thus, the fact that Plaintiff referenced work instruction forms does not negate the fact that she exercised discretion and independent judgment.

As in *Renfro*, 497 F.3d 73 at 577, the fact that Plaintiff may have consulted with various source materials for some of the technical information and used a computer to aid research and recommendations does not detract from the import of the discretion and independent judgment exercised. Plaintiff's primary duty was the performance of office or non-manual work directly

---

[5] Plaintiff could not resolve routing conflicts simply by looking at a table. (P.Depo., p. 70:1-22, 72:20-73:7). The routing table utilized by Plaintiff contained information relating highly technical, complex matters that can be understood or interpreted only by those with advanced and specialized knowledge or skills. (Hurst Decl., ¶15). Plaintiff also admitted that most of the point codes for the rehomes were not even in the routing table. (P.Depo., p. 68:14-23).

related to the management or general business operations of Defendant and/or its customers, and her primary duty included the exercise of discretion and independent judgment with respect to matters of significance. The decisions made by Plaintiff were of great significance, because if any of the information Plaintiff provided was incorrect, it could have stopped one of Defendant's customers from communicating with another carrier, effectively shutting down a customer's ability to do business. (P.Depo., p. 67:10-21). Accordingly, Plaintiff's primary duty as a Senior Network Provisioner involved the exercise of discretion and independent judgment with respect to matters of significance. Plaintiff satisfies all three elements of the administrative exemption under the FLSA. Accordingly, Plaintiff was exempt from the FLSA under the administrative exemption and Defendant is entitled to summary judgment.

C.    Two Year Statute of Limitations Applies to Plaintiff's Claim

While Defendant contends that summary judgment is appropriate on the issue of whether Defendant is liable for overtime under the FLSA, should the Court find that summary judgment is improper, Defendant argues in the alternative that summary judgment should be granted on the two year statute of limitations. Plaintiff's claim against Defendant extends into the three year statute of limitations, as she filed suit on July 23, 2010 and is seeking damages commencing January 11, 2008. (Plaintiff's Response to Court's Interrogatories).

Although the ordinary statute of limitations in cases brought under the FLSA is two years, a cause of action arising out of a willful violation of the FLSA may be commenced within three years after the cause of action accrued. 29 U.S.C § 255(a). To extend the statute of limitations to three years, "the employee must prove by a preponderance of the evidence that [her] employer either knew that its conduct was prohibited by the statute or showed reckless disregard about whether it was." *Alvarez Perez v. Sanford-Orlando Kennel Club,* 515 F.3d 1150,

1162-63 (11th Cir. 2008) (citing *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)).   A willful violation may be found when the employer "disregarded the very 'possibility' that it was violating the statute." *Alvarez v. IBP, Inc.,* 339 F.3d 894, 908-09 (9th Cir. 2003).   If an employer acts unreasonably but not recklessly in determining its legal obligation under the FLSA, then its actions should not be considered willful and the two-year statute of limitations should be applied. *Lockaby v. Top Source Oil Analysis, Inc.,* 998 F.Supp. 1469, 1471 (N.D.Ga.1998) (citing *McLaughlin,* 486 U.S. at 135 n. 13, 108 S.Ct. 1677). The determination of willfulness for purposes of ascertaining the statute of limitations period may be a decision either for the judge or the jury.   *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,* 515 F.3d 1150, 1162 (11th Cir. 2008).

Here, there is no evidence that Defendant knew that its conduct was prohibited by the FLSA or that it showed reckless disregard about whether it was prohibited by the statute.   In fact, the record evidence shows that Defendant evaluates positions to determine whether they should be classified as exempt or non exempt.   (Burks Depo., p. 16:6-17:25).   Because there are two exemptions that potentially apply to this position, Defendant's belief that the job was exempt was reasonable.   Plaintiff is unable to set forth any evidence that Defendant willfully violated the FLSA, acted recklessly or even disregarded the very possibility that it was violating the statute. Accordingly, any damages awarded to Plaintiff should be limited to the two year statute of limitations, as Plaintiff is unable to establish that Defendant willfully violated the FLSA.

## III.   CONCLUSION

Based on the foregoing, Plaintiff cannot establish a genuine dispute as to any material fact to avoid summary judgment, and Defendant is entitled to judgment as a matter of law as to all of Plaintiff's claims.

1452887.1

s/Angelique Groza Lyons
Angelique Groza Lyons, Fla. Bar No. 118801
alyons@constangy.com
Michael D. Malfitano, Fla. Bar No. 188247
mmalfitano@constangy.com
Cherie L. Silberman, Fla. Bar No. 0015724
csilberman@constangy.com
CONSTANGY, BROOKS & SMITH, LLP
100 North Tampa Street, Suite 3350
Post Office Box 1840
Tampa, Florida 33601-1840
(813) 223-7166 / Fax: (813) 223-2515
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of June, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served on this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to received electronically Notices of Electronic Filing.

s/Angelique Groza Lyons
Attorney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
## CASE NO.: 08:10-cv-01635-JSM-TBM

## SERVICE LIST

Carlos V. Leach, Esq.
Morgan & Morgan, P.A.
20 North Orange Avenue, Ste. 1600
P. O. Box 4979
Orlando, FL 32802-4979
Telephone: 407-420-1414
Facsimile: 407-425-8171
Email: cleach@forthepeople.com
Attorney for Plaintiff

24

1452887.1